# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

RAYMOND B. ULICKI,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C05-4060-MWB

**REPORT AND RECOMMENDATION**

---

## *TABLE OF CONTENTS*

*I.*    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*   **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . **2**

    *A.*   *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    *B.*   *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
        *1.*   *Introductory facts and Ulicki's hearing testimony* . . . . . . . . . **3**
        *2.*   *Ulicki's medical history* . . . . . . . . . . . . . . . . . . . . . . . . . **8**
        *3.*   *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . . **15**
        *4.*   *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

*III.*  **DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND**
     **THE SUBSTANTIAL EVIDENCE STANDARD** . . . . . . . . . . . . . . . . . . **19**

    *A.*   *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **19**
    *B.*   *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . **22**

*IV.*  **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

*V.*   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

# I. INTRODUCTION

The plaintiff Raymond B. Ulicki ("Ulicki") appeals a decision by an administrative law judge ("ALJ") denying his applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits. Ulicki claims the ALJ erred in failing to develop the record fully and fairly, making an unsupported determination of his residual functional capacity, and failing to resolve inconsistencies in the vocational evidence. (*See* Doc. Nos. 8 & 10)

# II. PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

On June 18, 2001, Ulicki protectively filed applications for DI and SSI benefits, alleging a disability onset date of October 15, 2000. (*See* R. 54-56, 296-300) Ulicki claims he is disabled due to "vision problems, dizziness, severe headaches, weakness, light headedness, loss of balance, memory lapse, back pain, [and] hip pain." (R. 79) He claims these conditions prevent him from working an eight-hour day, stating he cannot "handle physical labor" or work in hot weather, and he had poor attendance on the job "because of not feeling well." (*Id.*) Ulicki's applications were denied initially and on reconsideration. (R. 34-41, 44-48, 301-313)

Ulicki requested a hearing (R. 49-50), and a hearing was held before ALJ Andrew T. Palestini on July 6, 2004. (R. 315-62) Ulicki was represented at the hearing by attorney Kenneth A. Johnson. Ulicki testified at the hearing, and Vocational Expert ("VE") Julie Svec also testified.

On November 24, 2004, the ALJ ruled Ulicki was not entitled to benefits. (R. 14-24) Ulicki appealed the ALJ's ruling, and on March 23, 2005, the Appeals Council denied Ulicki's request for review (R. 7-11), making the ALJ's decision the final decision of the Commissioner.

Ulicki filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 1) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Ulicki's claim. Ulicki filed a brief supporting his claim on August 13, 2005. (Doc. No. 8) The Commissioner filed a responsive brief on September 16, 2005. (Doc. No. 9) Ulicki filed a reply brief on September 17, 2005. (Doc. No. 10) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Ulicki's claim for benefits.

### B. Factual Background

### 1. Introductory facts and Ulicki's hearing testimony

Ulicki was born in 1960, making him forty-four years old at the time of the hearing. He is about 5'9" tall and weighs 215 to 220 pounds. He is right handed. Ulicki lives by himself in a house in Webster City, Iowa. He finished the eighth grade, but then he started working and he cannot recall if he finished all of the ninth grade. He has difficulty reading and writing. He can do basic math if he takes his time. He has had no other education or training since he left school. (R. 318-20)

Ulicki worked as a bricklayer for many years. The job required him to lift up to eighty or ninety pounds on occasion. (R. 320)

Ulicki had a stroke on December 20, 2000. He was treated first in Hamilton County, Iowa, and then he was sent to Iowa City, where he remained for about ten days. His symptoms included nausea, sweating, balance problems, and his hands going "out of control." (R. 321) He did not lose consciousness, but stated "it was pretty close." (*Id.*) About two nights after he was released from Iowa City, he had what he believed to be another stroke. He was taken to a hospital by ambulance, but they checked him out and

then sent him home with instructions to return if he had further problems. (R. 321-22) He has not had further strokes, but he has occasions when he "shakes really bad . . . to where [he] can hardly walk[.]" (R. 322)

Ulicki has continued to be receive his follow-up care in Iowa City, with annual visits to check on his condition. In June 2004, he went to Iowa City with complaints of dizzy spells and light-headedness. He first went to his family doctor, who confirmed that Ulicki was not diabetic. The doctor thought Ulicki's symptoms might have something to do with his vision, so Ulicki went to the "[v]isual science" department in Iowa City. According to Ulicki, doctors determined his problem was not related to his vision, and they referred him to another department for further testing. (R. 322-24)

Ulicki stated he has had problems with his vision ever since his. He has blind spots in his right eye, and trouble with his peripheral vision on the right side. His distance vision is better than his near vision. If he tries to read something that is directly in front of him, he has trouble making out the letters. The amount and type of lighting makes a difference in how well he can see, but even with good lighting, he can only read for ten to fifteen minutes at a time before his vision begins to blur and he gets a headache. His vision worsens in hot weather and with physical exertion. When he watches television, he turns his head so he can see more out of his left eye because his right eye has trouble focusing. (R. 324-27, 331) He got bifocals at one time, but if he wears them for awhile to read and then takes them off, he has trouble seeing anything. (R. 349)

Ulicki has a driver's license, and he does not have much trouble driving, although he has to pay close attention to see road signs. His doctors have never told him not to drive, even immediately after his stroke. He does not drive much at night. During the day, he might drive to his mother's house, the grocery store, or down to the river to go fishing, but none of those locations is far from his house. (R. 327-28) Ulicki drove

himself from Webster City, Iowa, to West Des Moines, Iowa, for the hearing. He stated he had to stop about half-way.[1] (R. 350)

Ulicki estimated he gets headaches six times a week. Sometimes they last ten to fifteen minutes, and other times they may last for hours. (R. 329) He used to take Tylenol for his headaches, but according to Ulicki, testing has indicated his liver enzymes are elevated and his doctor have told him not to take Tylenol. He stated his headaches may occur "anywhere from behind [his] eye to the back of [his] neck," on the left side. (R. 330) The headaches usually are on the left side, which is the side on which he had his stroke. (*Id.*; R. 325)

Ulicki has problems with light-headedness when he gets overheated or starts sweating. The problem usually occurs when he is outdoors in the heat, but it also may occur indoors if he is cleaning or doing something that requires exertion. Physical exertion makes the problem worse. If he stops what he is doing as soon as he becomes light-headed, the condition may last twenty to thirty minutes or so. He has never remained light-headed all day long. The light-headedness has never occurred when he is just sitting at rest. Bending, stooping, crawling, kneeling, and those types of activities can bring on his light-headedness. (R. 330-32) Sometimes after he becomes light-headed, he will lose his balance and be unable to walk in a straight line. He can walk a couple of blocks or so before he begins to feel light-headed and somewhat dizzy. He has never fallen down, but he has bumped into walls on occasion. (R. 334-35) He cannot reach upward or look upward for any period of time because it will make him dizzy. (R. 341)

Since his stroke, Ulicki has had some problems with weakness in his hands. He stated both of his hands tire more quickly than they did before his stroke, particularly his left hand and arm. With his left hand, he drops things occasionally, such as when he is doing dishes. He experiences numbness in his left hand a couple of times a week.

---

[1] The court notes it is approximately 80 miles from Webster City to West Des Moines.

(R. 332-33)  He cannot lift as much as he used to, and estimated he could lift up to twenty pounds occasionally with his left hand, perhaps more with his right hand.  He has been diagnosed with degenerative disc disease in his back and hips, and he stated this causes him trouble when he tries to lift.  He doubts he could lift anything on a repetitive basis.  (R. 339-41)  He also has trouble sitting because it bothers his back.  If he is sitting in a comfortable position, he estimated he could remain seated for perhaps up to an hour at a time.  He stated it is easier for him to sit leaned over than to sit straight up.  (R. 341-42)

Ulicki has some problems with his memory, both short-term and long-term.  (R. 335-36)  He stated he has "grabbed hot things that . . . normally a person would realize that . . . they are hot[.]"  (R. 336)  He can only follow a recipe if he keeps looking back and forth.  He has trouble following the plot of an hour-long television show, and usually cannot recall the beginning by the time the show ends.  If he goes to the store, by the time he arrives he may not recall why he went.  (R. 336-37)

Ulicki does most of his own cooking, cleaning, laundry, shopping, and other household activities, but he stated he does things "a little at a time," and he seldom does something all at once.  (R. 338)  He has to go up and down stairs to do the laundry, which can bring on his symptoms.  He stated by the time he reaches the top of the stairs, he is "pretty much worn [out]."  (*Id.*)  He often leaves household projects incomplete because he will "just get wore out doing it."  (R. 337)  He has no difficulty dressing himself, bathing, and taking care of his personal needs.  (R. 347)

Ulicki stated that since his stroke, he is nervous being around a bunch of people and tries to avoid those situations.  He has difficulty following a conversation if people are talking around him.  (R. 338)  He also has trouble making decisions, and decision-making sometimes causes him feelings of anxiety or panic.  This occurs even when he has to make simple decisions, such as what to watch on television or what to eat.  (R. 339)

Ulicki stated he also gets sharp chest pains that he did not have before his stroke. The pains come and go depending on his level of activity. He does not get the pains during activity; they begin immediately after he stops. He gets the pains about once a week, and they generally last from two to five minutes. (R. 342-43)

Ulicki stated his condition has not improved much in the four years since his stroke, and his symptoms have remained relatively consistent since his initial recovery. (R. 343, 345)

Ulicki tried to return to his bricklaying job during the first part of 2001, three or four months after his stroke. His boss put him on light duty for about three weeks, and then Ulicki tried his regular work but he was unable to do the job. According to Ulicki, he "ended up bouncing into the wall and on a fresh brick wall that's not a good thing." (R. 345-46) That section of the wall had to be repaired. After the incident, he went home. (R. 346) He opined he would not be able to work at any job full-time, stating:

> Mornings ain't very good. I don't get up and move around on time like I should. I couldn't do it consistently. I have problems doing most anything consistently for, you know, any period of time. I'd have a pretty tough time doing it I think.

(*Id.*) He explained he has a hard time getting going in the morning. He may sit for half an hour "or just kind of wander around a little bit before [he gets] around to doing anything." (R. 347)

Ulicki expressed concern about working around other people. He stated he would not want to be responsible for causing someone to have an accident due to his dizziness. He believes he is "kind of hazardous to work around," noting even at home he does things differently than he did before. (R. 347-48)

Ulicki stated he does not use any alcohol. He smoked cigarettes at one time, but no longer smokes. (R. 349)

## 2. *Ulicki's medical history*

Preliminarily, the court notes Ulicki's alleged disability onset date is October 15, 2000, and he claims he is disabled due to residual effects after a stroke. However, his stroke occurred on December 20, 2000, and the first medical evidence of record begins December 21, 2000. There is nothing in the record to explain why Ulicki claims he became disabled as early as October 15, 2000.

Ulicki was seen in the emergency rom in Webster City, Iowa, on December 21, 2000, complaining of a headache and blurred vision. He had been seen by his doctor the day before and was referred to the ER for evaluation of his symptoms. Notes indicate Ulicki was a "heavy smoker." (R. 160) Funduscopic examination revealed bilateral papilledema, worse on the right side. A spinal tap yielded blood-tinged fluid. The ER doctor opined Ulicki had suffered a subarachnoid hemorrhage[2], and referred Ulicki to a neurosurgeon in Iowa City for immediate evaluation. (R. 160-63)

Ulicki was hospitalized for evaluation in Iowa City from December 21-30, 2000. (R. 164-77) Notes indicate Ulicki's symptoms began on December 17, 2000, when he woke up with blurred vision in his right eye, together with right eye pain. After Ulicki was seen in the ER on December 20, 2000, and transferred to Iowa City, he was started on Dilantin. He was found to have no neurologic deficits. He had no facial numbness or weakness, normal hearing, intact recent and remote memory, and a normal attention span and fund of knowledge. His coordination, station, gait, and sensation also were intact. (R. 165) An "angiogram revealed a right internal carotid artery dissection with distal thrombus," instead of the right transverse sinus thrombosis that originally had been suspected. Despite medication, Ulicki's right internal carotid artery occluded. However,

---

[2]Subarachnoid hemorrhage is a type of stroke that occurs when a blood vessel just outside the brain ruptures, causing the area of the skull surrounding the brain to fill with blood. The patient "may have a sudden, intense headache, neck pain, and nausea or vomiting[,] . . . rapid loss of consciousness or death." www.strokecenter.org/pat/sah.htm (March 14, 2006).

because he still had good collateral flow from his left internal carotid artery, and he "remained asymptomatic except for mildly decreased visual acuity in the right eye," he was treated with anticoagulation to stabilize his distal thrombus, with instructions to return for follow-up in one to two months, and to see his local physician weekly. (*Id.*)

Ulicki went to the ER on December 31, 2000, complaining of some numbness and tingling in his left hand and forearm that had lasted about ten seconds and then disappeared. He had no lingering symptoms, and a CT scan of his brain was unremarkable. He declined a suggestion that he add aspirin to his medication regime, noting he was taking Coumadin and it was helping him. (R. 179-80)

Ulicki developed an infected hematoma in his right groin area from an angiogram performed while he was in Iowa City. He was seen by a local physician, and then was transferred for evaluation by a surgeon in Fort Dodge, Iowa. On January 2, 2001, he underwent a procedure to drain the hematoma and repair "a large puncture site in the common femoral artery." (R. 188; *see* R. 183-87) He was treated with IV antibiotics, and was discharged on January 5, 2001, in stable condition "physically, emotionally, and mentally." (R. 188; *see* 188-99) He recovered well post-operatively, and his staples were removed on January 25, 2001. (R. 201-02) The doctor opined that Ulicki's groin hematoma would not render him disabled. (R. 201)

Ulicki was seen for follow-up in Iowa City on April 9, 2001. He complained of continued decreased vision in his right eye, and occasional activity-induced clumsiness in his left hand. (R. 242) A repeat SPECT scan[3] showed perfusion in his right frontal lobe had improved since his stroke, but perfusion in his right temporal and parietal lobes was worse than the previous study indicated. (R. 178) He was referred to the Neurosurgery department "for possible ECA/ICA bypass." (R. 243) The neurosurgeon noted Ulicki had

---

[3]A SPECT (Single Photo Emission Computed tomography) scan provides information about blood flow to tissue, which may help to determine how well the organ is functioning. www.spineuniverse.com (March 14, 2006).

not developed new symptoms, and he recommended Ulicki continue with his current treatment unless he developed signs of ischemia, at which point a bypass procedure might be indicated. He recommended Ulicki quit smoking, noting that smoking would "further compromise his circulation." (R. 241)

On October 9, 2001, Ulicki saw Dan L. Rogers, Ph.D. for a psychological evaluation at the request of Disability Determination Services. (R. 203-07) The evaluation was requested because Ulicki had reported having memory lapses and severe headaches. (R. 203) Ulicki told Dr. Rogers that he "used to drink 12-24 beers a week, but after the strokes he was told to quit use of alcohol[, and] now he drinks a few beers, once a week[.]" (R. 205) He also stated he used "a variety of drugs 'years ago,'" but no longer used any illicit drugs. (*Id.*) He also reported reducing the amount he was smoking from more than two packs per day in the past to less than one pack a day currently. (*Id.*)

Dr. Rogers found Ulicki's general memory functioning to be "from the retarded range to the average range," which he noted was "consistent with [Ulicki's] report of strokes." (*Id.*) Dr. Rogers reached the following conclusions regarding Ulicki's mental functional abilities:

> [Ulicki's] present memory functioning and mental status are consistent with his reports of two strokes a year ago. However, there also appeared to be an effect of his personality peculiarities and motivation and his actual abilities might be somewhat higher than the scores reflected. While working memory and auditory memory were below average they seemed to be adequate for most tasks, whereas visual memory was lower and would create difficulties in functioning.
>
> He displayed no signs of pain, gait problems, or difficulty with coordination.
>
> He can remember and understand instructions and procedures, though locations might be more difficult for him to retain. His attention and concentration are good but his pace might be poor, largely because of motivation. He is misanthropic in many ways [and] this would diminish his

ability to interact appropriately with supervisors, coworkers, and the public. His judgment and insight are only fair but, except for motivation, he would be able to respond to changes in the work place in an appropriate manner.

He is able to handle cash benefits.

(R. 206) Dr. Rogers diagnosed Ulicki with "Hysteroid personality."[4] (*Id.*)

On October 11, 2001, Claude H. Koons, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. He opined Ulicki would be able to lift up to twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for about six hours in an eight-hour workday; push/pull without limitation; occasionally balance; and frequently climb ramps or stairs, stoop, kneel, crouch, and crawl. He found Ulicki should avoid ladders, ropes, and scaffolds. He noted Ulicki's vision in his right eye was limited, but he had no limitations in his left eye. (R. 108-15) In his review summary, Dr. Koons noted Ulicki "lives alone, cooks, does housework, mows and weeds his yard as needed, drives, shops, fishes, works on cars, watches TV and walks the dog." (R. 216) He noted Ulicki "alleges chronic headaches for which he takes aspirin and some trouble with balance and picking up small items," but he nevertheless maintains "a rather complete range of activities at his home." (*Id.*)

On December 4, 2001, John C. Garfield, Ph.D. reviewed the record and completed a Psychiatric Review Technique form. (R. 218-31) He opined Ulicki has mild memory impairment that would cause him no functional limitations. (*Id.*) In his review summary, Dr. Garfield noted Ulicki had been "compliant, but not truly cooperative" during his testing by Dr. Rogers, causing his test results to be somewhat suspect. Dr. Garfield

---

[4] A person with hysteroid personality tendencies may overreact to stimuli and can act irrationally. As one doctor has explained it, "The hysteroid personality is mainly characterized by a strong need for social attention and respect as well as by a lack of emotional genuineness. . . . Hysteroid personality tendencies are significantly associated with extraversion, a certain degree of aggressiveness as well as with unconcern and sociability." F. Sullwold, "Structure of Hypochondriacal and Hysteroid Personality" (1990), available through the National Library of Medicine and National Institutes of Health's PubMed database, www.ncbi.nlm.nih.gov.

concluded that "because [Ulicki's] description of his activities of daily living reveals them to be fairly wide ranging, . . . no more than mildly limiting memory deficits have been documented." (R. 232) He found a "diagnosis of cognitive disorder [not otherwise specified] appears to be appropriate," but further found the impairment was not severe. (*Id.*)

On January 14, 2002, Ulicki was seen in Iowa City for follow-up of his December 2000 stroke. (R. 239-40) He was doing well generally, but complained of worsening vision in his right eye and "some intermittent problems with his left hand, specifically clumsiness as well as a fatigued feeling." (R. 239) He was referred to the Ophthalmology Clinic to evaluate his vision problems. With regard to his hand, doctors opined his symptoms were "more likely carpal tunnel syndrome than representing any further deficiency of his cerebral perfusion." (*Id.*) They prescribed wrist splints for Ulicki to wear at night on both arms, and scheduled EMG nerve conduction studies. (R. 239-40)

Ulicki was seen in the Ophthalmology Clinic on April 26, 2002. He complained of increasingly blurred vision on activity, and stated he saw "squiggly things that come and go." (R. 244) During the examination, the doctor noted Ulicki "seems restless. The more I test the less he sees." (R. 247) Ulicki was diagnosed with optic nerve head drusen of the right eye,[5] which was noted to be somewhat "guesswork" due to inconsistent test results. (*Id.*) Ulicki declined a prescription for eyeglasses, and he was advised to return for follow-up in one year or as needed. (R. 245)

On April 26, 2002, Ulicki underwent an EMG nerve conduction study to evaluate his problems with his wrists and hands. The study "showed findings compatible with early or mild left media neuropathy of the wrist, i.e.: carpel [sic] tunnel syndrome." (R. 276)

---

[5]Optic nerve head drusen is a "condition involving retained hyaline bodies in the anterior optic nerve." It affects approximately 1% of the population. These tiny tumors develop within the substance of the nerve tissue and can lead to an elevated disc and, sometimes, a loss of vision. *Handbook of Ocular Disease Management* § 50a (Jobson Pub. 2001) (*see* http://www.revoptom.com/handbook/default.htm).

Doctors recommended Ulicki continue wearing the fitted wrist splints on both arms at night, and return for reevaluation in six to nine months. (*Id.*)

On July 1, 2002, Joseph X. Latella, D.O. wrote a letter to Disability Determination Services following a physical examination of Ulicki. Ulicki reported he had not worked for ten months and was "living off savings and some borrowed money from his friends and family." (R. 248) He stated he smoked one pack of cigarettes daily, drank socially, and did not use illicit drugs. He did not wear glasses or use a hearing device. Dr. Latella noted Ulicki's "lumbar spine x-rays do show degenerative changes in the lumbar spine." (*Id.*; *see* R. 253, radiology report noting "[v]ery mild degenerative change") However, his spinal reflexes all were normal, he could flex to 90 degrees, and he had normal extension. He exhibited 20/50 vision in his right eye, 20/30 in his left eye, and 20/30 using both eyes without glasses. Dr. Latella found Ulicki to have arthritis of the lumbar spine, but otherwise his report contains no significant findings. (R. 248-50)

On July 10, 2002, Chrystalla B. Daly, D.O. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (R. 254-60) She assigned exertional limitations identical to those of Dr. Koons in October 2001. She found Ulicki's allegations of disabling back pain to lack credibility on the basis of his full range of daily activities, and because upon examination by Dr. Latella, he showed "full range of motions of all joints, normal gait, and negative straight leg raising test. (R. 256-57) She further noted that although Ulicki "alleges back pain 90% of the time, there is no longitudinal record." (R. 259) She found Ulicki would have limited use of his hands for overhead reaching/lifting and handling, but no limitations for fingering or feeling. (R. 257)

On July 12, 2002, David A. Christiansen, Ph.D. reviewed the record and completed a Psychiatric Review Technique form. (R. 261-74) He found Ulicki to have memory problems that could cause him mild difficulties in maintaining concentration, persistence, or pace, but otherwise, he found no limitations on Ulicki's functioning due to any mental

disorder.  (*Id.*) In his review comments, Dr. Christiansen noted Ulicki had no new mental allegations since his previous review of December 2002, and no allegations that his mental condition had worsened.  (R. 275)  He affirmed the previous review as written.  (*Id.*)

On November 2, 2002, Ulicki returned to Iowa City for follow-up of his post-stroke condition.  He had not had any recurrent events and was "not felt to be a candidate for EC/IC bypass."  (R. 277)  He was directed to quit smoking, continue taking aspirin, and return for follow-up in one year.  (R. 278)  In addition, Ulicki's visual acuity was worse than when he was seen by the Ophthalmology Clinic in April, and he also exhibited a Relative Afferent Pupil Defect (RAPD).  He was referred to Neuroophthalmology for evaluation.  (R. 277-78)

He was seen by a neuroophthalmologist on January 8, 2003.  Steven Goldin, M.D. indicated that although the RAPD was not noted in the records during Ulicki's April 2002 examination, it likely was present at that time based on his visual field examinations.  Dr. Wall noted no changes in Ulicki's visual system, and no new recommendations were made. (R. 279-80)

Ulicki was seen in the emergency room on August 4, 2003, complaining of pain in his chest and back subsequent to twisting toward his back.  He exhibited pain between his fourth and fifth ribs, close to the sternum.  He was diagnosed with a thoracomuscular strain.  (R. 288)  He was scheduled for an EKG because of his past history of stroke, and the EKG was normal.  (R. 287)

Ulicki saw his family doctor on May 19, 2004, complaining of not feeling well, and of feeling light-headed when he did not eat.  He continued to complain of headaches in the back of his head and behind his eyes, and of poor vision, especially if he did not eat. Ulicki was "convinced he [had] diabetes like his mother," and he wanted glucose testing. (R. 290)  Testing revealed Ulicki's cholesterol was high.  (R. 291)

Ulicki returned to the Ophthalmology Clinic in Iowa City for recheck on June 11, 2004. He complained of occasional episodes of light-headedness and dizziness with increased exertion. Examination revealed his eyes had remained stable since 2002, with no new changes noted. (R. 294-95)

### 3. Vocational expert's testimony

The ALJ asked VE Julie Svec the following hypothetical question:

> I'd like the vocational expert to initially consider what effect it would have on the Claimant's ability to perform work activity if the Claimant was limited to no more than 20 pounds occasional lifting, 10 pounds frequent lifting and not above shoulder level. Claimant could sit for eight hours total in a day with normal breaks. He could stand for eight hours in a day with normal breaks. The Claimant can walk up to one block at a time. He could occasionally crawl – I'm sorry, occasionally stoop and climb stairs, seldom bend, squat or crawl and never climb ladders or work on platforms. He is able to use the right hand for simple grasping, gross manipulation, basic fingering and handling and feeling frequently but not continually. He's able to use the left hand occasionally for the same activities. He can push and pull no more than 20 pounds, should not work in areas of excessive heat. Work should be simple, routine, repetitive. It should involve no more than superficial interaction with the public. He should not have to operate hazardous equipment. The work should not be stressful so that it should not involve a fast pace, strict quotas or strict timeframes. No frequent changes of duties or decision-making. Should not be required to remember detailed information to complete the job duties or to relate any detailed information . . . to others. He should not be required to have any fine visual acuity on the right side and because of anticoagulation medications he should avoid use of sharp objects and tools. With those limitations could the Claimant return to his past relevant work?

(R. 353-54) The VE responded in the negative.

15

The ALJ then noted that Ulicki "is a younger individual with a limited education such that any work activity should involve only basic reading, writing and math." (R. 354) The VE stated that with those limitations, as well as those set forth in the hypothetical question, the individual would be able to work as a parking lot attendant (370 positions in Iowa; 18,000 nationwide), cashier (10,000 in Iowa; 900,000 nationwide), or laundry folder (450 in Iowa; 50,000 nationwide). She stated all of those positions are at the light exertional level. (*Id.*) The VE stated her opinion would not change if the individual were limited to sitting no more than thirty to sixty minutes at a time before changing position. (R. 355)

Upon questioning by Ulicki's attorney, it became clear that the VE had heard the ALJ's first hypothetical question incorrectly with regard to use of the individual's hands. Upon reiteration by the ALJ that the individual's left hand could be used only occasionally for simple grasping, gross manipulation, basic fingering and handling, the VE stated the laundry folder job would be eliminated. (R. 355-56)

With regard to the cashier and parking lot attendant jobs, the VE stated they would require only basic math skills. She noted both are unskilled jobs. In addition, the VE indicated she was relying on the fact that in most such jobs, the individual is not required to calculate the amount of change due a customer, but can rely on a cash register readout as to how much change is due. (R. 356-57) The VE stated that although those jobs can become fast-faced at times, "in [her] experience they are not always fast paced." (R. 357)

The VE stated if the individual were unable to complete tasks in a timely manner on a regular basis due to symptoms as described by Ulicki, he would be precluded from all competitive employment. (R. 360)

## 4.    *The ALJ's opinion*

The ALJ found Ulicki has not engaged in substantial gainful activity since his alleged disability onset date of October 15, 2000.  (R. 18)  He found Ulicki has severe impairments including "arthritis of the lumbar spine, status post internal carotid thrombosis, status post embolism to the right hemisphere of the brain, and hysteroid personality."  (R. 19)  However, he further found Ulicki's impairments, either singly or in combination, did not reach the Listing level of severity.  (R. 19-20)

The ALJ found the objective medical evidence did not support the severity of limitations alleged by Ulicki.  He noted "[n]umerous examinations of [Ulicki] have shown his physical limitations are at most mild," and the State agency consultants have opined he could perform work at the light exertional level despite his impairments.  (R. 20-21)  The ALJ accepted the State agency consultants' opinions that Ulicki does not have a severe mental impairment and "few, if any, mental limitations."  (R. 21)  While the ALJ accepted that Ulicki cannot return to his past work as a bricklayer, he noted Ulicki cannot be found disabled if he is able to perform other work.  He found Ulicki's allegations not to be fully credible based on the record evidence.  (*Id.*)

The ALJ found Ulicki retains the following physical residual functional capacity:

> [T]he claimant can lift no more than 20 pounds occasionally and no more than 10 pounds frequently.  The claimant also cannot lift above shoulder level.  The claimant can only walk for one block at a time.  He can stoop and climb stairs occasionally.  He can bend, squat, and crawl seldom.  The claimant can never climb ladders or perform work on platforms.  The claimant's work should not require fine visual acuity on the right side due to anti-coagulates.  He also should avoid sharp objects and tools.  The claimant can sit and stand for 8 hours in an eight-hour day with normal breaks.  The claimant can perform simple grasping with his right hand as well as gross manipulation, basic fingering, handling, and feeling frequently.  The claimant, however, cannot do these activities continuously.  In regards to his left hand, the

claimant can perform all the above-cited activities. The claimant cannot push or pull more than 10 pounds. He also must avoid excessive heat and should not operate hazardous equipment. In regards to his mental abilities, the claimant has a limited education and his work activities should involved only basic reading, writing, and mathematics. The claimant is also limited to simple routine repetitive activities. He cannot have more than superficial interaction with the public. His work also should not be stressful and should not be performed at a fast pace with strict quotas or strict timeframes. Additionally, the claimant's duties should not change frequently and his need to make decisions should be infrequent. He also should not be required to remember detailed information to complete job duties or relate detailed information or data to others.

(*Id.*)

With regard to Ulicki's mental abilities, the ALJ found his "mental condition causes mild limitations in his activities of daily living, moderate difficulties in social functioning, and mild difficulties in maintaining concentration, persistence, or pace." (*Id.*) He concluded Ulicki's "mental condition is not expected to cause episodes of deterioration or decompensation of an extended duration." (*Id.*)

The ALJ also noted Ulicki has some history of abusing alcohol and other drugs, but he concluded this predated Ulicki's alleged onset date. He further concluded that because he found Ulicki not to be disabled, he need not address Ulicki's substance abuse. (R. 17-18)

The ALJ relied on the VE's testimony in concluding that although Ulicki cannot return to his past work as a bricklayer, he "could perform other work that exists in significant numbers in the regional and national economy, including work as a parking lost [sic] attendant and cashier." (R. 22-23) He therefore concluded Ulicki is not disabled, nor has he been under a disability at any time through the date of the ALJ's decision. (R. 23)

### III.  DISABILITY DETERMINATIONS, THE BURDEN OF PROOF,
### AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A.  Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.  20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)).  First, the Commissioner will consider a claimant's work activity.  If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.  20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."  *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003).  The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . .  Such

abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain

non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. *The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91,

99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not

discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)     the claimant's daily activities;
> 2)     the duration, frequency and intensity of the pain;
> 3)     precipitating and aggravating factors;
> 4)     dosage, effectiveness and side effects of medication;
> 5)     functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. ANALYSIS

Ulicki argues the ALJ failed to develop the record fully and fairly regarding his work-related limitations. He argues his impairments are unusual, making his an atypical disability case. He therefore argues that because none of his treating or examining sources offered a statement regarding his limitations, the ALJ should have obtained a consultative examination by a specialist to determine how his visual problems and other impairments impact his functional abilities. (Doc. No. 8, pp. 12-15) In particular, Ulicki relies on

*Lauer v. Apfel*, 245 F.3d 700 (8th Cir. 2001), and *Nevland v. Apfel*, 204 F.2d 853 (8th Cir. 2000), in arguing "the ALJ was required to consider at least some supporting evidence from a professional[,] and medical evidence was required to establish how [the] claimant's impairments affected her [sic] RFC." (Doc. No. 8, p. 13) As Ulicki notes in his reply brief (Doc. No. 10), the Commissioner failed to cite or distinguish *Nevland* or *Lauer*. (*See* Commissioner's brief, Doc. No. 9)

Ulicki argues further that the ALJ erred in failing to credit the additional visual limitations imposed upon Ulicki by the state agency consultants. (*Id.*, pp. 17-18) In addition, he argues the ALJ failed to resolve inconsistencies in the vocational evidence, specifically what Ulicki views as conflicts between the VE's testimony and the characteristics of the parking lot attendant and cashier jobs according to the Dictionary of Occupational Titles ("DOT"). (*Id.*, pp. 20-21)

The Commissioner devotes the majority of her argument to the ALJ's credibility assessment (*see* Doc. No. 9, pp. 12-16) – an interesting fact given that Ulicki does not discuss the credibility determination at all in his brief. The Commissioner then argues the ALJ performed a proper determination of Ulicki's residual functional capacity based on the evidence of record, and the record contained adequate evidence to make such a determination without further development. (*Id.*, pp. 19) The Commissioner further claims there was no conflict between the VE's testimony and the DOT descriptions of the parking lot attendant and cashier jobs. (*Id.* at p. 20)

An ALJ has a duty to develop the record fully and fairly, even when a claimant is represented by counsel. *Nevland*, 204 F.3d at 857 (citing *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983)). Ulicki is correct that an ALJ must "consider at least some supporting evidence from a [medical] professional" in evaluating a claimant's RFC. *Lauer*, 245 F.3d at 704 (relying on *Nevland*). However, when the treatment and examination notes themselves demonstrate a claimant is not disabled, the court finds it is

not error for an ALJ to fail to ask the treating and examining sources for specific statements regarding how the claimant's non-disabling impairments would impact upon his ability to work.

The record evidence indicates Ulicki had a stroke from which he largely recovered. He continues to have problems with the vision in his right eye, but his vision has not worsened since his stroke, and indeed, Ulicki declined a prescription for eyeglasses. Furthermore, he was uncooperative during his eye examination to the extent that his diagnosis of optic nerve head drusen was noted to be partially guesswork. Ulicki also has some problems with his wrists and hands which doctors have opined are unrelated to his stroke. He has been diagnosed with probable carpal tunnel syndrome, and wrist splints have been prescribed. However, Ulicki has not sought further treatment and surgery has never been recommended. The ALJ's hypothetical question to the VE took into consideration the fact that Ulicki cannot perform continual, repetitive actions with his right hand. Ulicki also claims disability due to arthritis of his lumbar spine, but during his examination by Dr. Latella, Ulicki demonstrated full ranges of motion of all of his joints and normal gait. His full range of daily activities also demonstrates functional abilities beyond what he alleges. Similarly, the record evidence indicates Ulicki's mental limitations are quite mild, and would cause hm little, if any, difficulty on the job.

In summary, the court finds there was no need for the ALJ to develop the record more fully in order to determine that Ulicki's residual functional capacity, from both a physical and a mental standpoint, would not prevent him from working. The Commissioner did not attempt to distinguish *Nevland* and *Lauer* because there was no need to do so. The record contains substantial evidence to support the ALJ's determination that Ulicki is not disabled.

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[6] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be affirmed.

**IT IS SO ORDERED.**

**DATED** this 15th day of March, 2006.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[6]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).